19.37.40 North Canton Board of Education v. New Singular Wireless PCS Arguments not to exceed 15 minutes per side. Ms. Caldwell, you may proceed for the appellant. May it please the court, I'm Jacqueline Caldwell, counsel for the plaintiff appellant, North Canton Board of Education. I'd like to reserve five minutes of rebuttal time. The issue before the court is whether the AT&T appellees breached section 10b of its lease when the school when it failed to share 50% of the $696,247 of consideration that it received from the AT&T crown transaction since the alleged management agreement at issue is actually a sublease as a matter of law under Ohio Supreme Court law. You're not alleging that they didn't receive any distribution, it's just that they didn't receive an appropriate share. And if that's the argument, why they were already receiving something? Why wasn't this, why didn't this constitute double dipping if they were to get an additional distribution? Your Honor, yes, we didn't receive any portion of the $696,247. Yeah, but you did receive other monies, correct, from AT&T? We did receive other monies from AT&T from revenue sharing from T-Mobile and Verizon who were on the polls, yes. Okay. And this does not constitute double dipping in the case at hand because the alleged manager in the case, CCATT, has the right to put communications equipment on the poll. And if it does put that communications equipment on the poll, it doesn't have to pay any lease revenue or rent in connection with that. And so we wouldn't be obtaining any revenue in connection with CCATT putting equipment on the poll. In addition, there are two polls on the site and there are six locations where wireless communication could be. Only three of And so what really happened here, it was prepayment for the right to market and either put itself on the poll or three other co-locators. And that is even shown in the third whereas clause of the master agreement where the parties say that CCATT intends to market all the available space on these sites and to maximize co-location payments. They really were buying the unused locations on the site and the right to put co-locators on. But are they getting the revenue from Verizon and T-Mobile? Are they getting the co-location revenue? The school is, yes, receiving co-location revenue. No, not the school, CCATT. Yes, yes they would. So you agree that Crown Castle, it was essentially a prepayment and they got in exchange the revenue stream that was already out there, right? We think it's a prepayment for those unused locations on the poll for which there's no revenue stream at this point. But aren't they getting the revenue? I mean, they in fact are getting the revenue stream, right? Almost, not from the unused locations. So there are three users on the poll, but there are six locations. So they get revenue from two of the users on the poll, but the school does not get revenue from New Singular Wide. Can I ask you about that, Ms. Caldwell? Because is there any evidence that this is payment for the unused locations? I think so. And I think it's reflected in that third whereas clause originally in the master agreement where it says that the reason that Crown Castle is entering into this is to market all available space. That's those three unused locations on the site and to maximize co-location revenue. I'm sorry to interrupt you, but wouldn't that be for North Canton's benefit? In other words, if they do get people in those spots, North Canton gets a cut of the revenue. But what will happen is just like AT&T received prepaid revenue, we would receive a prepaid share. And I understand your argument on that, but am I correct in thinking AT&T, if let's say someone shows up, T-Mobile or someone, and takes one of those spots, AT&T wouldn't get any of it, right? You would get a cut and the management would keep a cut. We would not get a cut because if we receive our share of that $696,000, we would get prepaid. No, I understand that. So we would not get a share until that's exceeded. But if you didn't get the prepayment that you're claiming you're entitled to, then you would get a cut, right? We would at that point. Okay, thank you. And also, it's also not double dipping because the parties in the master agreement understood that under some of these leases, it would constitute revenue sharing. And they provided for that in the master agreement, section 4B, where they said, parties, in the case where it does constitute revenue sharing, in good faith, we all agree that the payment of this consideration for this particular site, the school site, for example, does constitute revenue sharing. It falls within revenue sharing. What you can do in that instance is you can simply change the label and call it a management agreement. And then you can take it outside the revenue sharing strictures. But in the case at hand, just calling it a management agreement doesn't work under Ohio law because it still is a sublease. So the parties understood that. Let me ask you, I'm sorry. So under your theory, the 696, so some of it or maybe all of it is for this empty space that could possibly be used for co-location. Is that a use or is that a sublease under the section 10 or whatever? Well, it likely would depend on exactly the facts and circumstances in connection with each situation. But I think it would, it certainly probably would be a sublease. But the facts and the circumstances are set right now. You're saying you get a share of the 696. Correct. That's a pre- Oh, I'm sorry. I didn't understand. Is it a sub, so what does it fall under? Is it a sublease or is it a use? It would be clearly a sublease for sure. For example, T-Mobile and Verizon are subleasing space on the pole at issue right now. And other folks, if they were going to be on it, typically they enter into a sublease. Right. But so you're saying that Crown Castle, well, essentially Crown Castle, then CCATT is subleasing the empty spots on the tower, hoping that they can find some, someone else to put on the tower? It has the right- So they're subleasing the space on the tower until they find a tenant for that space. But they're subleasing the entire premises and both of the poles subject, of course, to prior subleases. So they're subleasing the entire premises. Wouldn't we have to rewrite the management contract to find it's basically a sublease? I don't think so. No, your honor. I think the way it's written right now, it is a sublease. It certainly transfers a specific identified portion of the premises and that is the entire premises. And if you look at the management agreement- So are all management contracts subleases then? Whenever someone enters into a management contract, it's a sublease? No, but in the case at hand, I would most easily, this is seen through section 4A and 4B of the master prepaid lease. Section 4A says, and I did not highlight this in my brief, that CCATT really says tower operator, but in our circumstance, it's CCATT, shall abide by, comply with, and perform all applicable terms, covenants, and provisions under the school's ground lease, I'm putting school in, as if CCATT were the ground lessee, as if it were tower holdings. Likewise, section 4B delegates the lessee, tower holdings, delegates to CCATT under 4B, the sole and exclusive right to perform the obligations of, assert, and exercise the rights of tower holdings, the lessee, under the lease. They specifically transferred every right and power that they have to CCATT. And then to couple that, you know, just because, of course, the Ohio Supreme Court said that the leasehold interest that has to transfer is when you give the right of possession of the land and also exclusive occupation of it for all reasons not otherwise prohibited by the lease, coupling, giving every right and obligation under the lease to be performed by CCATT, then section 3A Romanette 6 of the management agreement says, and by the way, we, as the lessee, tower holdings, and new senior wireless, we covenant to you that we haven't in the past and we won't in the future give any other person any right to use or occupy the site. On top of that, they gave the covenant of quiet enjoyment that no AT&T entity would hinder or interfere. So they gave more, this isn't a management agreement, this is where they gave every single right under the lease, and by the way, undisputed facts in the record are the lessee tower holdings has no employees. Even if one would say, gosh, some duties remained with CCATT as lessee, it has no employees. Those are answers to interrogatories and also confirmed in 30B 6 deponent David Behan's deposition. They don't do anything. They transferred everything. Your time is up. You may use the time if you wish to continue. I'm fine. I'm fine. Thank you very much. Okay. Was there another question at this juncture from one of the other judges before I go to her? Okay, well, you'll get your rebuttal time. We'll now hear from the appellee. Thank you, Judge Donald. Ben Sasse on behalf of Appellee's New Singular and Tower Holdings. I'd like to pick up on a couple points raised earlier by Your Honor and Judge Nalbandian, and that relates to the revenue stream and why it constitutes double dipping. What happened here is that site manager CCATT's corporate parent paid money to lessee tower holdings corporate parent to acquire certain rights with respect to over 9,000 cell tower sites. Can I ask you, I'm sorry to interrupt you, but would it really be double dipping if it's a prepayment? I mean, if you get prepaid for the site, do you agree you have to share it? So, Your Honor, I would agree we would have to share it depending on what the double dipping is, depending on what the payment is for. And I think, you know, if I could just finish my thought for a moment, where I was going with this is that the payment is for the existing revenue streams. And this is most clearly seen if you look at Exhibit 27 of Steve Byron's deposition and the associated testimony. What he explains is, and that's a spreadsheet, it runs out the payments that the inflows and outflows that the lessee was going to receive under the ground lease. These are how these sites were valued under the master agreement between the corporate parents. It said how much money is the lessee going to take in and how much money is the lessee going to have to pay out under the applicable ground leases. And so what happened was if you subtract the outflows, which is the payments that are due for revenue sharing from the inflows, then what's left is the margin, right? And so that margin over time became the basis of the valuation that North Canton is seeking in this case. And so the reason it constitutes double dipping is they are taking a share of the lessee's margin over the lifespan of the case. Can I ask you a question, though? I'm curious. If I were to discount the cash flow from Verizon and T-Mobile, you're saying I get to a number that approximates the prepayment number, right? I mean, what about that? Was there any value? The four empty spots have some value, right? Was there any consideration for that? Or is that just tied up in the management duties and everything else that was exchanged as part of the whole master deal? I, Judge Nalbandian, I think that does have value. And I think that's why CCAT wanted to do the deal. And if I could clear up a misrepresentation by my friend on the other side, it's not our position and never has been our position that if somebody else were to co-locate on the tower, North Canton would not be entitled to a share of that money. Where I was going with my explanation and what Steve Byron said is the payment was based on the then existing revenue streams that were going in and going out. So absolutely, if CCAT were to bring another user to the tower, then a share of that revenue would have to be shared with North Canton. And we've never said otherwise. The issue here is there is no other revenue stream. That's not what CCAT itself does. CCAT is a management company. Like if you would think of an apartment management company or something along those lines, Vicki Davis was very clear in her deposition testimony at pages 41 through 43. They do things like check to make sure the fence is still up, spray for weeds, pick up garbage, process the payments. If there's another co-location agreement, if it's Sprint or somebody, who is that agreement between? Who gives them the right to be on that tower? So there's a power of attorney that was granted to CCAT to allow CCAT to negotiate those deals. And that's in the transactional documents. So CCAT has the power to negotiate that deal, but none of the leasehold interests transferred. And I guess the other thing is, there's a question of whether it even has to be a leasehold interest that transfers, right? Because if you're looking at the lease at Section 3, it grants a non-exclusive license to use. There's, I don't think you would even have to transfer a leasehold interest to transfer a license. And certainly CCAT has a power of attorney from Tower Holdings to do that and to attempt to bring new users to the tower. And indeed, one of the reasons for this transaction is, as you might imagine, it is easier for someone who is a site manager, like a Crown Castle and its subsidiaries, to attract new users to a tower than it is for AT&T to get its competitors to co-locate on its tower. So there is a value add by going to a company like Crown Castle. And the idea is that Crown Castle would be able to attract new users to the tower that would benefit everybody, including North Canton. The issue here is, Let me ask you this. So the person who co-locates on the tower is a licensee, right? They're not a sub-lessee. I think it could be written either way, Your Honor, depending on the underlying agreement. And that was why I think that Section 10b was written the way it was. They wanted to capture co-location in all its forms. I find, I do find the underlying lease a little bit odd because it's a lease, it's called a lease, but the use, what the lessee is allowed to do seems to be fairly strictly circumscribed in Section 3. In other words, the district judge said that if you wanted to sublet a shed on the property or a billboard or something on the pole, that if that's, you could do that. But I'm curious, could you do that as a use? In other words, could you allow somebody else to use the property to have a storage facility and then take in the money? Or would that be prohibited by the lease because it doesn't fall under Section 3? That's an interesting point. I don't think AT&T has ever attempted to do that. I don't know that it was necessary for the district court to go there. I think what we're saying is the license that was granted was solely to put equipment up on the tower, and indeed, that's the sole way you make money off of these cellular towers is by somebody putting equipment on the tower and then you get a revenue stream. Now, there are other forms of broadband type stuff that could be put on the tower, so if for some reason you needed something that was a pertinent to the tower in order to be able to operate that other equipment and that somehow hypothetically required a shed or some other space, I think the lease language is broad enough that would allow that kind of incidental operational stuff to be on the grounds. But you're absolutely right that the use is sharply circumscribed under the lease. And our point is what CCAT is doing is not using the property as the use is contemplated under the lease. So is it your position that what CCAT is doing is maintaining the property under the lease provision that obligates the lessee to keep the property in a certain condition? Is that what CCAT is doing is permissible under the lease because the lessee would have been permitted or would have been obligated to do it? That's correct. Section 7c of the lease obligates originally New Singular and now through their managerial appointment CCAT to keep the premises in good condition. And so our position is that CCAT is doing exactly that. And the money that was prepaid has nothing to do with CCAT itself being on the tower, nor does it have anything to do with future co-locators that may be on the tower. All it was was an agreement between Crown Castle and AT&T of the existing users of the tower over the life of the lease. If we had to put a number to that figure, what would that figure look like once you back out all payments due to the lessor for revenue sharing? And so there was a spreadsheet. It's Exhibit 27 to Steve Byron's deposition. They went through very detailed inflows and outflows. And of course it's not those payments, but also the ground rent that is due New North Canton under the lease. But I assume that the number took into account the management services that Crown Castle would be providing to AT&T also? Crown Castle gets a separate payment from an AT&T entity under what's called a site location agreement, your honor. That's in the record at 107-16. If you look at Sections 8 and 10, there's a fee paid to Crown Castle. That's a revenue stream that Crown Castle gets that's separate and apart from, and that's ongoing from an AT&T entity, and that's separate and apart from the money that was paid that is at issue in this appeal. So the 696, and I apologize, and I was confused. So the 696 really does trace back to the Verizon and T-Mobile payments that were existing at the time the agreement was signed? Yes, that's exactly right. Minus the rent or whatever, or including the rent stream, or I guess the rent would have to go out. Who pays the rent? Tower Holdings? CCAT's responsible for making payments and processing the invoices. So the way the deal works is the up front, Crown Castle and AT&T agreed on a figure that would account for the existing Verizon and T-Mobile usage. That usage, and then once you backed out the ground rent that was due under the lease and the revenue sharing that was due for those existing uses, the two parties came up with a figure based on the life of the lease, and that figure is what North Canton is seeking in this case. And so to circle back to where I started with Judge Donald, our point is that's double dipping because what they're trying to do is get the lessee's share of its future revenue streams under the lease, and they're not entitled to those under the language of the lease documents or the language of the transactional agreements. In terms of whether or not this is in fact a sublease, all the documents say over and over and over again that no leasehold interest transfers. The way I would suggest going through if you want to explore that issue is further start with the master agreement. If you look at the master agreement that's at record 93.9, section 1.1 specifies as an excluded asset the leasehold interest except to the extent that the master prepaid lease would transfer it. You turn to the master prepaid lease at record 93.14, section 3c says there is no transfer of a leasehold interest for a managed site. Then you go down to the management agreement itself, both recital b2 and section 1 make the same point, that's record 93-16. I also want to push back on this point that there's some sort of scheme or something whereby we were trying to keep this from being revenue sharing, and this is where this comes in. If you look at the management agreement, you will see that the fixed asset number, which is the way this works in the context of the deal for 9,000 different cell tower sites, the fixed asset number for this site, and you can confirm it's the fixed asset number by the way, it's Steve Viren's deposition at page 45, but for this site appears in exhibit a2 to the management agreement. Why is that significant? It's because this is what is called a pre-lease site. Why does that matter? Well, if you look back at the definitions in the master agreement, you'll see it's a pre-lease site because there had to be a consent obtained to actually make this a lease, and who did the consent need to come from? It needed to come from North Canton, and there was a 18-month period in section 4 of the master agreement for that consent to be filled out, and it never happened, and so what we're hearing now is, you know, after North Canton never signed off on making this a lease site, they're now saying, oh well, it should have been a lease site all around anyways, and that's not only inconsistent with the fact that they didn't sign the consent, it's also inconsistent with the letter sent in September 2014, where they focused solely on use as the argument that they were making for why they were entitled to revenue sharing. It's inconsistent with the subsequent second amendment to the lease, and the estoppel certificate, which contemplated and expressly recognized that CCAT was performing in a management role, and that Tower Holdings was the lessee, and did not account for any money as a result of these managerial duties, and I really think that this argument only turned up once after Vicki Davis's deposition. It became clear that what CCAT was doing in no way, shape, or form constituted a use under section 3 of the lease, so at the end of the day, what you have is a company that was paid for future lessee revenue streams to do things like spray for weeds, make sure the fence is maintained, and process the invoices, and none of this arises to revenue sharing under the agreement. If there is another co-locator brought to the Tower, then yes, North Canton will be entitled to revenue sharing for that new user, but no new user has appeared on the Tower yet, and at this point, what they're seeking is part of the lease. There are no further questions. Thank you, Your Honor. So just I want to clarify to go back to my original questions. So the potential that you could get, that you could co-locate on one of the four openings, did Crown Castle pay for that opportunity? It's not part of the 696, right? Correct. I would say they acquired that opportunity, Your Honor. The only thing I would push back on is to say it paid for it, because the analysis, there is a large overall figure, and then there were valuations that were very complex and detailed done, and they were based on existing revenue streams. Did they acquire it? Absolutely. Is there a document I can point to that say it paid a specific amount of money for that? No. Okay. I mean, it seems like there were a lot of revenue streams, and there does seem to be more detail here than I thought in terms of the way each other, but if there isn't one for that one, I mean, I assume that they knew it was valuable. They knew it was valuable, exactly, and that's why they wanted this right, and if there is a future co-locator, that money will be shared. Well, that money and AT&T wouldn't get any of that money, right? It would be the Crown Castle or CCAT or some entity that paid for that right, and then they would share it with North Canton, but AT&T itself would never see that money again, right? That's exactly right. Okay. Thank you. Anything further? All right, then. Thank you, sir. We'll hear from the appellant in rebuttal. You're muted. You're muted, Madam. It appears that I'm not. Yes, we can hear you now. Thank you, Your Honor. I'd first like to show that they just did a few little upkeep maintenance items. Instead, she also testifies that part of her job was to communicate with the lessor. That would be the school, and in fact, she and Steve Veron, both 30B6 deponents in the case at hand, they actually dealt with the rent issue. There was a long-standing, from 2012 to 2015, mispayment and underpayment of the T-Mobile and the Verizon payments, and so CCATT, Vicki and Steve Veron handled that, so they handled everything with the lessors. They also handle everything with Verizon and T-Mobile, and Vicki Davis testified to this as well. She testified if there's a modification out there, if they want to upgrade the technology on a pole, for example, there's many departments of CCATT that work with Verizon and T-Mobile to do this. Really, it's wrong. It's incorrect. It's inaccurate to say they just had a few little items that they could do. Number one, it's wrong because Vicki Davis testified otherwise, and number two, it's wrong because we really glean the rights and obligations from the contract documents, and the contracts give full rights and obligations to do everything under the lease to CCATT, and they preclude anybody else, whether it's AT&T or any other third party, from doing any action in connection with that lease site. The only one at this point that can take action in connection with the school site is CCATT, so factually, it's incorrect, and also, there was only one payment made, and that was the 696. The payment that was discussed that was made from New Singular, that's because New Singular is on one of those towers, and it makes a payment to CCATT. That's not shared with us. The payment that New Singular pays, there's two co-locators that we get a share of payment from, Verizon and T-Mobile. New Singular, an AT&T entity, is on the pole. We get nothing from that share. That goes all directly to CCATT, and they don't pay rent? No, they don't pay anything to us. You don't get rent under the lease? We get, under the lease, we get payment streams in connection with T-Mobile and Verizon. We don't get any payment stream in connection with the AT&T entity that's on the pole, the third person, and that would be the same. I mean, we should probably get that. We're not getting it, but there's value to those three vacant locations on the pole. Again, I would point you to the very third whereas clause, which says why CCATT and Crown Castle entered into this transaction, and it was to take advantage of those co-locations, of being able to add additional co-locators. If you get what you want, which is part of the 696,000, and they go out tomorrow and get Sprint to be a co-locator, are you saying that you're not entitled to any of the, a share of the Sprint revenue for the next 20 years or whatever it would be? No, we would have been prepaid unless they pay more than that prepayment is. If somehow it would exceed the prepayment, but no, your honor, we would not be entitled to that. How would you calculate that number on whether it was more? I would suppose if you had three co-locators, and you measured their stream out for 30 years, and it exceeded that amount, but only in that way, and maybe it's not possible to actually calculate that, but no, typically, we would not get paid because just like AT&T, we'd be prepaid for that 30-year stream. And in addition, it truly is a sublease, and the narrative that was told, it does not comport with the lease agreement, the management agreement, which is actually a sublease agreement. The real estate interest was transferred, as I discussed, giving them exclusive use of the entire site, except for already given subleases, an exclusive opportunity to do it, and all obligation to take all actions. In addition, there's a purchase option never seen in a true management agreement, covenant of quiet enjoyment. There's no management fee paid at all. So they just simply prepaid as a sublease for the entire right to use this premises, and they get no management payment. And also, if we back up, the reason at time one, North Canton My time is up. Is my time up, Your Honor? Let me see though. Yes, it is. But if you were answering a question, or if one of the other judges has a question, I'll let you answer that. But are there any further questions of counsel? Okay, then your time is up, and we appreciate your argument. We appreciate all arguments in the case. It is submitted, and we will issue an opinion in due course. Thank you. Thank you, Your Honor.